UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

MEGAN AROON DUNCANSON,                )
                                      )
                    Plaintiff,        )
                                      )
        v.                            )        No. 1:16-cv-00788-SEB-DML
                                      )
WINE AND CANVAS IP HOLDINGS LLC,      )
et al.                                )
                                      )
                    Defendants.       )

**ORDER ON PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT (DKT. 206)
AND FOR LEAVE TO FILE EXCESS PAGES IN SUPPORT (DKT. 202)**

Plaintiff Megan Aroon Duncanson ("Duncanson") sued a congeries of Indiana

limited liability companies and two of their chief members or officers (collectively,

"Wine and Canvas") under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* ("the

Act"), for direct, vicarious, and contributory copyright infringement. Now before the

Court is Duncanson's motion for summary judgment, *see* Fed. R. Civ. P. 56, to which

Wine and Canvas has failed to respond. For the reasons explained below, the motion is

denied. Duncanson has also moved for leave to file an oversized brief in support of

summary judgment, which we grant without further discussion. *See* S.D. Ind. L.R. 7-

1(e)(2).

## Background

The facts are uncontested to the extent supported by admissible evidence, S.D.

Ind. L.R. 56-1(f)(1)(A), though we construe them in the light most favorable to the

nonmovants. S.D. Ind. L.R. 56-1(f)(1)(C). Wine and Canvas comprises one head and

thirteen members. The head is Wine and Canvas IP Holdings LLC ("W&C Holdings"). The members (collectively, "the Licensees") are Wine and Canvas Development LLC ("W&C Development"), based in Indianapolis, Indiana, and eleven LLCs each doing business in a different American city: Cincinnati, Columbus, and Dayton, Ohio; Des Moines, Iowa; Detroit, Michigan; Fort Wayne and South Bend, Indiana; Las Vegas, Nevada; Odessa, Texas; Portland, Oregon; and San Francisco, California. We will refer to each of these by "W&C" and the city in which it operates. There is also "W&C Napa Sonoma," for the Napa and Sonoma Valleys in California.

Aptly named, Wine and Canvas offers its patrons the opportunity to paint while drinking alcohol. Specifically, the Licensees are in the business of offering "classes," advertised to the public, in which "students" pay a fee to the Licensee to receive group instruction in reproducing a certain "Featured Painting" provided by the Licensee while drinking and socializing with other students. The instruction is provided by Wine and Canvas painters, who are independent contractors of the Licensees. The Featured Paintings for upcoming Licensee classes are published on the Wine and Canvas website, www.wineandcanvas.com. At the conclusion of each class, the Licensee often posts photos of students displaying their paintings to the Licensee's Facebook page.

W&C Holdings operates like a franchisor, licensing the Wine and Canvas brand to the Licensees as well as maintaining a portfolio of paintings from which a Licensee may choose its Featured Paintings. A Licensee may also select a work not in W&C Holdings's portfolio for use as a Featured Painting so long as W&C Holdings approves the work

beforehand. W&C Holdings receives an 8 percent royalty from each Licensee class, except those held by W&C Development and W&C Columbus.

At the times relevant here, the Wine and Canvas businesses were managed in part by Tamara McCracken (also known as Tamra Scott, here "McCracken") and Anthony Scott ("Scott"). As "Art Director" for W&C Holdings, McCracken curated its art portfolio and approved or rejected out-of-portfolio paintings submitted by the Licensees for use as Featured Paintings. McCracken was also a manager of W&C Development. Scott was the president and a manager of W&C Development, the managing member of W&C Holdings, and a manager of each Licensee during its first year in existence. As the managing member of W&C Holdings, Scott oversaw its daily operations, including oversight of the Licensees. McCracken and Scott shared in the profits of W&C Holdings, which, as already noted, receives a royalty from most Licensee classes.

Duncanson is a Florida artist who paints original works. She has been active at least since 2006. Her art is marketed on the Internet, and may be found on Duncanson's personal websites as well as various social-networking websites, including Pinterest and Facebook.

By mid-April 2012, Duncanson had become aware that Licensees were using what appeared to be her works as Featured Paintings in their classes. On April 16, 2012, she sent an e-mail to McCracken and others, of which Scott was made aware, "request[ing] that [they] cease and desist using any of [her] images for profit or non-profit," adding that it was "not only immoral but also illegal and violate[d] international copyright laws."

Ex.[1] 4, at 10. The e-mail included links to Duncanson's personal websites and Facebook gallery, but did not identify specific paintings used by specific Licensees.

On February 7, 2013, McCracken received a second e-mail from Duncanson alleging copyright infringement by Wine and Canvas. On February 14, 2013, McCracken forwarded to the Licensees, in her words, "four pictures of paintings that were replicated by contracted artists employed by Wine and Canvas. These paintings look almost identical to the original artwork . . . ." Ex. 34-1, at 1. The four pictures showed replicas of four of Duncanson's original works. At some time before February 21, 2013, W&C South Bend notified Scott that Duncanson had commented on a W&C South Bend Facebook photo that she was "VERY upset at this company 'Wine and Canvas[.]' . . . They have numerous locations all across the country using m[y] . . . [p]ainting[s] and other artists['] work without our permission[.]" Ex. 8, at 3.

On or about May 12, 2014, McCracken reviewed a copy of a complaint filed by Duncanson in the United States District Court for the Middle District of Florida for different acts of infringement by different Wine and Canvas affiliates than those complained of in this case. *See* 6:14-cv-00704-PGB-KRS (M.D. Fla.). But the complaint in that case did include reproductions of some of the works now in suit.

This lawsuit is an action to recover for dozens of acts of infringement by Wine and Canvas over a period of three years. The infringements alleged are, so to speak, of three generations. Duncanson maintains that Wine and Canvas painters copied her original

---

[1] All freestanding "Ex." citations refer to the exhibits attached to Duncanson's motion for summary judgment at Dkt. 206.

works and presented their copies as Featured Paintings to students at Licensee classes—
the first-generation copies, *i.e.*, the painters' copies of Duncanson's originals. Wine and
Canvas students would then receive instruction from Wine and Canvas painters in
reproducing the Featured Paintings—the second-generation copies, *i.e.*, the students'
copies of the painters' copies. Finally, Licensees would post pictures of its students
holding their paintings to the Licensees' respective Facebook pages—the third-generation
copies, *i.e.*, the Licensees' copies of the students' copies of the painters' copies. The
Featured Paintings, that is, the first-generation copies, were either approved by
McCracken or selected by McCracken for inclusion in W&C Holdings's art portfolio.

Duncanson's complaint contains thirty-six counts, Count 11 having been
withdrawn, Dkt. 75, each alleging infringement of Duncanson's copyrights in a specific
painting by a specific Licensee class on a specific date. Under each of these counts,
Duncanson seeks to hold the named Licensee directly liable for the first-generation
copying, contributorily liable for each act of second-generation copying by each student
in attendance at the class, and directly liable for the third-generation copying. Further,
under each of these counts, for each separate act of infringement, Duncanson seeks to
hold W&C Holdings, McCracken, and Scott vicariously liable. There are also two further
counts on which liability has been determined by default, as explained below.

These are the ten works in suit, cited by title, date of first publication, copyright
registration number, and effective date of registration: *Bubbling Joy* (Nov. 16, 2006),
VA0001860451 (Mar. 2, 2013); *Birds of a Feather* (Aug. 30, 2008), VA0001872072
(Aug. 14, 2013); *Fine Wine* (June 5, 2007), VA0001872069 (Aug. 13, 2013); *First Snow*

*Fall* (Sept. 27, 2012), VA0002037544 (Feb. 29, 2016); *Out West*, *in Published Paintings 2008* (Jan. 1, 2008), VA0001905186 (July 30, 2013); *Spring Shine* (June 3, 2011), VA0001872068 (Aug. 9, 2013); *Tropical Energy*, *in Published Paintings 2006* (Jan. 1, 2006), VA0001860474 (Mar. 2, 2013); *Tropical Goodbye* (July 13, 2012), VA0001951595 (Feb. 27, 2015); *Twisting Love* (Nov. 5, 2011), VA0001872071 (Aug. 9, 2013); and *Visionary Delight* (Nov. 14, 2012), VA0001965292 (June 14, 2015).

We take judicial notice of the registration information for *First Snow Fall*, *see Turina v. Crawley*, No. 10 C 4292, 2012 WL 568050, at *3 (Feb. 16, 2012) (on plaintiff's summary judgment motion, taking judicial notice of plaintiff's copyright registration) (citing *Island Software & Comput. Serv. Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d Cir. 2005)), for, at the time Duncanson filed her initial complaint (to which she attached the registration certificates on which she now relies), the registration application was still pending before the United States Copyright Office. *See* Second Am. Compl. (SAC) ¶ 15.

We also take judicial notice that *Tropical Energy* appears to have been registered twice, once as part of the *Published Paintings 2006* collection cited above, and once as a freestanding work, first published September 14, 2006, VA0001910928 (Sept. 23, 2013).

Finally, we take judicial notice of the registration of *Twisting Love*, which Duncanson has not included in her statement of undisputed facts or her evidentiary designations. *See* Ex. 1. The Copyright Office in fact reports two registrations for two paintings, *Twisting Love 2007* and *Twisting Love 2011*, both registered within four days of each other and both credited to Duncanson. The Copyright Office reports no other registration for any other work titled *Twisting Love*. We have given the registration

information for the later-published work, *Twisting Love 2011*, but the choice makes no difference to Duncanson's case.

The operative complaint was filed on July 13, 2016. Dkt. 27. Duncanson's motion for summary judgment was filed on December 22, 2017. Dkt. 206. As discussed further below, the Clerk entered the default of five Licensees on December 27, 2017. Dkt. 211. After receiving a one-month extension of time in which to respond to the instant motion, Dkt. 225, Wine and Canvas failed to respond by the new deadline of February 23, 2018, instead filing a motion for a second extension on April 12, 2018, nearly two months later. Dkt. 239. We denied the motion the next day. Dkt. 240. Duncanson's unresponded-to summary judgment motion is now ripe for decision.

## Standard of Decision

As the Seventh Circuit has explained succinctly,

> A motion for summary judgment is a contention that the material facts are undisputed and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The party pursuing the motion must make an initial showing that the agreed-upon facts support a judgment in its favor. *See* Rule 56(a) & (c)(1); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Where, as here, the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts which it believes satisfies these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim. *See Reserve Supply Corp. v. Owens–Corning Fiberglas Corp.*, 971 F.2d 37, 42 (7th Cir.1992). If the movant has failed to make this initial showing, the court is obligated to deny the motion. *See Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 662 (7th Cir.2011).

*Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (additional citations omitted).

Under our local rule, the nonmovant's failure to respond to the movant's statement of material facts not in dispute constitutes the nonmovant's admission of those facts. S.D. Ind. L.R. 56-1(f)(1)(A). The Seventh Circuit has "consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission." *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) (addressing N.D. Ill. counterpart) (citing *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 689 (7th Cir. 2000)). This failure does not, however, result in a default judgment for the movant. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 426 (7th Cir. 1997). Reasonable inferences from the admitted facts must still be drawn in the nonmovant's favor, *id.*, *also* S.D. Ind. L.R. 56-1(f)(1)(C), and "[t]he choice between reasonable inferences from facts is a jury function." *Smith*, 129 F.3d at 426. The default admission of the movant's facts simply "[r]educ[es] the pool from which these inferences may be made . . . ." *Id.*

## Analysis

We begin with liability before proceeding to damages. The liability of certain Licensees is established by default. But as to the remaining Defendants, Duncanson has not shown the absence of genuine disputes of material fact. We therefore do not reach the question of those Defendants' damages. As to the defaulted Licensees, we find Duncanson's damages are genuinely disputed. However, Duncanson's motion has established certain material facts in her favor beyond genuine dispute; we note these in concluding.

## I. Setting Aside Defaulted Defendants, Whether Any Named Defendants Are Liable for Infringement Is Genuinely Disputed

As a preliminary matter, the Clerk has already entered the default of five Wine and Canvas LLCs, to wit: Dayton, Detroit, Fort Wayne, Las Vegas, and Napa Sonoma. Dkt. 211. "'Upon default, the well-pleaded allegations of a complaint relating to liability are taken as true.'" *VLM Food Trading Int'l, Inc. v. Ill. Trading Co.*, 811 F.3d 247, 255 (7th Cir. 2016) (alteration restored) (quoting *Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983)). "'Once the default is established, and thus liability, the plaintiff still must establish h[er] entitlement to the relief [s]he seeks.'" *Id.* (quoting *In re Catt*, 368 F.3d 789, 793 (7th Cir. 2004)). As to these defaulted Defendants, then, we take Duncanson's motion for summary judgment as a motion for default judgment under Federal Rule of Civil Procedure 55(b)(2). *See VLM Food*, 811 F.3d at 255. But, as explained below, Duncanson fails here to establish her entitlement to the relief she seeks as a matter of law. Thus, these matters will be determined after a future hearing on a motion for default judgment, *see* Fed. R. Civ. P. 55(b)(2)(A)–(D), or else on a subsequent motion for summary judgment.

Section 106 of the Act vests six "exclusive rights" in copyright holders. 17 U.S.C. §§ 106(1)–(6). Three are relevant here: the rights "to reproduce the copyrighted work in copies . . . [,]" "to prepare derivative works based upon the copyrighted work[,]" and "to display the copyrighted work publicly[.]" *Id.* §§ 106(1)–(2), (5). *See* SAC ¶ 62. Duncanson's suit does not require strictly distinguishing between the Subsection 1 reproduction right and the Subsection 2 derivation right; accordingly, we do not decide

whether the alleged infringements are properly characterized as "copies" or as "derivative works." *See* 17 U.S.C. § 101, paras. 10, 14. The Subsection 5 display right protects both. *Conrad v. AM Cmty. Credit Union*, 750 F.3d 634, 637 (7th Cir. 2014).

We consider first what infringements are conclusively established by the record. We proceed to consider which Defendants may be liable for them, and on what theories.

A. *What Infringements?*

To establish copyright infringement under the Act, a plaintiff must prove "'(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Muhammad-Ali v. Final Call, Inc.*, 832 F.3d 755, 760 (7th Cir. 2016) (quoting *Peters v. West*, 692 F.3d 629, 632 (7th Cir. 2012)).

As for the first element, "[g]enerally, copyright protection begins at the moment of creation of 'original works of authorship fixed in any tangible medium of expression[.]'" *JCW Invs., Inc. v. Novelty, Inc.*, 482 F.3d 910, 914 (7th Cir. 2007) (quoting 17 U.S.C. § 102(a)). "Fixing" occurs "'when [the work's] embodiment in a copy . . . is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration.'" *Id.* (quoting 17 U.S.C. § 101, para. 20). A certificate of copyright issued by the Copyright Office within five years of the work's first publication is "'*prima facie* evidence'" of the copyright's validity. *Id.* (quoting 17 U.S.C. § 410(c)). "The evidentiary weight to be accorded [a certificate of copyright] made thereafter shall be within the discretion of the court." 17 U.S.C. § 410(c).

Duncanson's ownership of valid copyrights in the works in suit, as set forth in her statement of material facts not in dispute, has been "admitted without controversy" by

Wine and Canvas, S.D. Ind. L.R. 56-1(f)(1), (f)(1)(A), and is amply supported by the registration records submitted by Duncanson, Dkt. 1. Ex. 1, though copyrights in only some of the works were registered within five years of first publication (*Spring Shine*, *Birds of a Feather*, *Tropical Goodbye*, *Visionary Delight*, and *First Snow Fall*). No facts in the record support a contrary inference. Accordingly, we find Duncanson has satisfied the first element of infringement as a matter of law.

As for the second element of infringement, "copying" "is used in two senses." *Runstadler Studios, Inc. v. MGM Ltd. P'ship*, 768 F. Supp. 1292, 1296 (N.D. Ill. 1991). Copying as a factual matter—that is, the fact "that defendant was aware of plaintiff's work and relied upon it in creating" the accused work, *id.*—"may be proven by direct evidence," *JCW Invs., Inc. v. Novelty, Inc.*, 482 F.3d 910, 915 (7th Cir. 2007), "such as an admission of copying[.]" *Peters*, 692 F.3d at 633. Where that is unavailable, factual copying may be proved by showing "(1) 'that the defendant had the opportunity to copy the original (often called "access")'; and (2) 'that the two works are "substantially similar," thus permitting an inference that the defendant actually did copy the original.'" *Muhammad-Ali*, 832 F.3d at 761 (quoting *Peters*, 692 F.3d at 633).

But "[n]ot all copying . . . is copyright infringement." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). "Copying" in the legal sense—that is, improper appropriation of another's work constituting actionable infringement—requires the additional showing of "substantial similarity as a matter of law . . . demonstrat[ing] that the defendant's copying extended to the plaintiff's protectible expression." *Stillman v. Leo Burnett Co.*, 720 F. Supp. 1353, 1358 (N.D. Ill. 1989) (discussing *Atari, Inc. v. N.*

*Am. Philips Elecs. Co.*, 672 F.2d 607 (7th Cir. 1982), *superseded by statute in nonrelevant part*).

In sum,

> proving the basic tort of infringement simply requires the plaintiff to show that the defendant had an actual opportunity to [and did] copy the original (this is because independent creation is a defense to copyright infringement), and that the two works share enough unique features to give rise to a breach of the duty not to copy another's work.

*Peters*, 692 F.3d at 633–34. *See also Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005) (citing *Atari*, 672 F.2d at 614). As a matter of terminology, when used to prove factual copying by inference, the "leading treatise on copyright law," *Schrock v. Learning Curve Int'l, Inc.*, 586 F.3d 513, 523 (7th Cir. 2009), refers to "substantial similarity" as "'probative similarity.'" 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.01[B] (quoting Alan Latman, *"Probative Similarity" as Proof of Copying: Toward Dispelling Some Myths in Copyright Infringement*, 90 Colum. L. Rev. 1187 (1990)). To avoid confusion, we will too.

We begin with factual first-generation copying. Predictably, there are no admissions from Wine and Canvas painters that they in fact copied the works in suit. Scott testified in open court in the Florida lawsuit that Wine and Canvas painters had "copied" Duncanson's art after seeing it on Pinterest, Ex. 35 105:7, 126:9, but a reasonable jury would not be compelled to accept his testimony as conclusive. Among other reasons, there is no way of knowing to which of Duncanson's works Scott was referring. A reasonable inference arises that Scott's testimony was restricted in scope to

some or all of the works in suit in the Florida case, which did not encompass all the works in suit here. *Compare* 6:14-cv-00704-PGB-KRS (M.D. Fla.), Dkt. 36 ¶¶ 18–19 (operative complaint at time of Scott's testimony), *with* SAC ¶ 15. *See Tank v. T-Mobile USA, Inc.*, No. 1:12-cv-10261, 2013 WL 4401375, at *5 (N.D. Ill. Aug. 15, 2013) (citing *Facebook, Inc. v. Teachbook.com LLC*, 819 F. Supp. 2d 764, 771 (N.D. Ill. 2011)) (permitting judicial notice of docket entries in other cases).

McCracken's February 14, 2013, e-mail to the Licensees is also direct evidence of copying, but similarly inconclusive. McCracken wrote that she had "attached four pictures of paintings that were replicated by contracted artists employed by Wine and Canvas. These paintings look almost identical to the original artwork they found on Pint[e]rest or another website." Ex. 34-1, at 1. Attached to McCracken's e-mail are apparent reproductions of three of the works in suit, *Fine Wine*, *Twisting Love*, and *Bubbling Joy*. But it is unclear whether McCracken was reporting her own evaluation of the works' similarity (which may be probative of factual copying but is far from conclusive of it), or inadmissible hearsay admissions of copying made by Wine and Canvas painters to McCracken or someone else, or the results of an independent investigation made by McCracken or someone else.

So, having failed to establish factual first-generation copying conclusively by direct evidence, Duncanson must establish it by inference: access plus probative similarity.

As for access, Duncanson's art was available for viewing online to anyone with an Internet connection, and Scott and McCracken admitted that Wine and Canvas painters were able to access Duncanson's paintings on Pinterest and other websites.

As for probative similarity, we proceed from the position that, on this plaintiff's motion for summary judgment, we will consider only infringement claims for which we are able to establish beyond genuine dispute that the alleged first-generation copies (*i.e.*, those works alleged to be copies of the works in suit made by Wine and Canvas painters) are actually in the record before us. Those are as follows: Count 13 against W&C South Bend for *Twisting Love*, Count 14 against W&C San Francisco for *Spring Shine*, Count 21 against W&C Development for *Birds of a Feather*, Count 31 against W&C San Francisco for *Birds of a Feather*, Count 32 against W&C Portland for *Out West*, and Count 35 against W&C Portland for *Visionary Delight*.

For each of these counts, with the exception of Count 13 against W&C South Bend for *Twisting Love*, Duncanson supplied to each Licensee a screenshot of the Licensee's on-line calendar showing the Featured Painting for a particular class, and obtained the Licensee's admission that the calendar entry was a true and correct representation of the Featured Painting for that class. For example, here is the calendar entry corresponding to the infringement charged in Count 14:



Ex. 32, at 18. As the calendar entries were managed by McCracken or at least approved by her, we may be sure that the works appearing in the calendar entries were the ones actually used as Featured Paintings and were included in the Wine and Canvas portfolio.

As to Count 13 against W&C South Bend for *Twisting Love*, Duncanson supplied to W&C South Bend an enlarged segment of a photo posted to the Licensee's Facebook page showing a painting hanging on the wall in the background, and obtained the Licensee's admission that the painting pictured was actually used as the Featured Painting in the class sued on in Count 13:



Ex. 12, at 13.

But for every other count of the complaint not already determined by default, we cannot say that any reasonable jury would be compelled to conclude that what Duncanson calls the first-generation copies actually are such. For example, in a number of instances Duncanson has obtained the admission of a Licensee that a certain work was the Featured Painting for a particular class—but the work supplied to the Licensee for admission appears to be Duncanson's original. For example, Duncanson obtained the admission of W&C Columbus that the work below was the Featured Painting for its April 11, 2013, class, as charged in Count 1:



Ex. 16, at 2. For comparison, here is what Duncanson claims as her original *Spring Shine*:



Ex. 1, at 4. To all appearances, apart from minor differences in formatting, these two representations are not merely probatively or substantially similar, but identical. There is no doubt that, unless requested and permitted to be withdrawn, the Licensee's admission "conclusively establishe[s]" that *Spring Shine* was the Featured Painting for the Licensee's April 11, 2013, class. Fed. R. Civ. P. 36(b). But proof of intent to copy is not the same as proof of copying. In other words, Duncanson must show that a copy was actually *made* by a Wine and Canvas painter. By conclusively establishing her original works as Featured Paintings, she has failed to do so.

In some cases, the Licensee's discovery respondent was not taken in by Duncanson's stratagem. For example, here is a request for admission propounded to

W&C Cincinnati in connection with Count 19, apparently containing Duncanson's original *Tropical Goodbye*, together with the Licensee's response:

**Request No. 2.** The image below is a true and correct representation of the "**Featured Painting**" painted at a Wine and Canvas event you held on or about June 28, 2014.



**Response No. 2** This painting is not the actual painting we used on the calendar. This is similar however it is not that actual painting, so DENY.

Ex. 14, at 2. As the Licensee's respondent points out by implication, this is not the Featured Painting sued on in Count 14, but an actual reproduction of Duncanson's original:



Ex. 1, at 6. But Duncanson's briefing elides this distinction. *Compare* Br. Supp. 12
("[W&C Cincinnati] held an event on June 28, 2014, where the featured painting was a
rendition of and similar to the painting depicted [above].") *with id.* at 34 ("A side-by-side
comparison of the featured painting used by [W&C Cincinnati] at its June 28, 2014 class
(Count 19) with Duncanson's *Tropical Goodbye* demonstrates substantial similarity
between the works."). As will be noted, the Licensee of course never admitted that the
June 28, 2014, Featured Painting "was a rendition of" Duncanson's original, *id.* at 12,
still less that Duncanson's original was "the featured painting used by [W&C Cincinnati]
at its June 28, 2014 class . . . ." *Id.* at 34.

In still other cases, the Licensee has flatly denied that Duncanson's original was a
Featured Painting, whereupon Duncanson has simply supplied us with an alleged third-
generation copy (that is, a Facebook photo showing Wine and Canvas students displaying
their paintings) and asked us to infer first- and second-generation copying as a matter of

law from the third-generation copy. For example, in connection with Count 30, Duncanson propounded the following request for admission to W&C Des Moines, apparently containing Duncanson's original *Birds of a Feather*:

**Request No. 1.** The image below is a true and correct representation of the painting **you** referred to as "Birds on a Line."[1]



**Response No. 1**     Deny.

Ex. 20, at 2. Here is an excerpt from Duncanson's designated chart comparing the accused works and the works in suit side-by-side:



Ex. 39, at 3. Duncanson's briefing, however, again simply elides the distinction: "A side-by-side comparison of the featured painting used by [W&C Des Moines] at its November 14, 2014 class (Count 30) with Duncanson's *Birds of a Feather* demonstrates substantial similarity[.]" Br. Supp. 36. As will be noted, Duncanson has put nothing at all in the record which purports to be "the featured painting used by [W&C Des Moines] at its November 14, 2014 class . . . ." *Id.* Rather, she has supplied us with an alleged third-generation copy of *Birds of a Feather*, and then asks us to work our way up the chain of copies connecting Duncanson's original to the Facebook photo above by inference—and by an inference which *any reasonable jury* would be compelled to make.

Further, even where we have taken a first-generation copy as established for the purposes of a specific count against a specific Licensee for a specific class, we are unable to take that first-generation copy as established for all purposes as to all counts. First, Duncanson has designated no evidence compelling the inference that, because one particular Licensee used one particular first-generation copy of a Duncanson original as a Featured Painting, therefore every Licensee alleged to have infringed copyrights in the same original used the same first-generation copy as its Featured Painting. Second, Duncanson has designated evidence that, in fact, tends to show the contrary. In her

February 14, 2013, e-mail to the Licensees, McCracken stated that "[she] ha[d] had a few art submissions th[at] month with paintings that look like" the four Duncanson originals which McCracken attached to her e-mail. Ex. 34-1, at 1. This suggests that Duncanson had received multiple submissions, that is, multiple potential first-generation copies, per each Duncanson original. The side-by-side comparisons below in connection with Counts 21 and 31 strongly suggest that at least two distinct copies of *Birds of a Feather* were used by Wine and Canvas.

In sum, with the exception of the counts identified at the outset of this discussion, for which we are confident in having the alleged first-generation copy actually in the record before us, Duncanson's copying-by-inference arguments are simply a bridge too far to be traversed on a plaintiff's motion for summary judgment. We by no means deny that a reasonable jury could draw the inferences contended for; we deny only that any reasonable jury would be compelled to draw them on the record now before us.

The point is not merely academic. As already explained, under each count of her complaint, Duncanson seeks to hold the named Licensee directly liable for the first-generation copying, contributorily liable for each act of second-generation copying by each student in attendance at the class, and directly liable for the third-generation copying. Further, under each of these counts, for each separate act of infringement, Duncanson seeks to hold W&C Holdings, McCracken, and Scott vicariously liable. In other words, all liability Duncanson seeks to impose on Wine and Canvas necessarily flows from provable first-generation infringement. Duncanson invites us to impose that liability as a matter of law on the basis of a chain of inferences drawn in her favor,

moored to a shaky evidentiary foundation. Because that is contrary to fundamental summary judgment procedure and would impermissibly trench on the jury's exclusive province, we must decline her invitation.

With that ground cleared, we proceed to consider whether Duncanson, having already shown access, has also established probative similarity of the first-generation copies and her originals, showing factual copying as a matter of law.

As to Count 13 against W&C South Bend for *Twisting Love*, here is the alleged first-generation copy on the left, side-by-side with Duncanson's original on the right:

 

Ex. 12, at 13; Ex. 39, at 4. Though the reproduction of the alleged first-generation copy is small and blurry, it contains enough elements of *Twisting Love* that are unlikely to be the product of independent creation so as to give rise to a compelling inference that the alleged first-generation copyist did in fact copy *Twisting Love*. Of particular note, the

heart-shape formed by the twisting branches of the copy in fact reflects the title of Duncanson's original more obviously than does the original itself, strongly suggesting that the painter took Duncanson's work, title and all, as a model.

As to Count 14 against W&C San Francisco for *Spring Shine*, here is the alleged first-generation copy on the left, side-by-side with Duncanson's original on the right:




Ex. 32, at 18; Ex. 1, at 4. Again, the reproduction of the alleged first-generation copy is of poor quality, but it admits of enough comparison with Duncanson's original so as to establish factual copying beyond genuine dispute.

As to Count 21 against W&C Development for *Birds of a Feather*, here is the alleged first-generation copy on the left, side-by-side with Duncanson's original on the right:

 

Ex. 4, at 5; Ex. 1, at 5. It appears nearly impossible that the alleged copy did not take Duncanson's original for its model. Accordingly, this side-by-side comparison establishes factual copying beyond genuine dispute.

As to Count 31 against W&C San Francisco for *Birds of a Feather*, here is the alleged first-generation copy on the left, side-by-side with Duncanson's original on the right:

 

Ex. 32, at 27; Ex. 1, at 5. The poor reproduction of the alleged copy notwithstanding, the similarity here is just as striking as that under Count 21 immediately above, and similarly establishes factual copying beyond genuine dispute.

As to Count 32 against W&C Portland for *Out West*, here is the alleged first-generation copy on the left, side-by-side with Duncanson's original on the right:

 

Ex. 30, at 30; Ex. 1, at 10. Especially with respect to the unique, not obviously representational, fan- or peacock-tail-shaped element in the center, the probative similarities between the two works are sufficient to establish factual copying beyond genuine dispute.

Finally, as to Count 35 against W&C Portland for *Visionary Delight*, here is the alleged first-generation copy on the left, side-by-side with Duncanson's original on the right:




Ex. 30, at 23; Ex. 1, at 7. As with the copies of *Birds of a Feather* examined above, the striking similarity between the two works establishes factual copying beyond genuine dispute.

Having established factual first-generation copying by access plus probative similarity for Counts 13, 14, 21, 31, 32, and 35, we proceed next to consider whether any reasonable jury would be compelled to conclude that Duncanson has established improper appropriation, that is, "copying" and "substantial similarity" in the legal sense.

In the Seventh Circuit,

> [a] "side-by-side" or "ocular" comparison is used to determine whether two works are substantially similar. [*Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 506 n.1 (7th Cir. 1994).] The determination of substantial similarity is made by using the ordinary observer test, that is "'whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of

> substance and value.'" *Wildlife Express*, 18 F.3d at 509
> (quoting *Atari*[, 672 F.2d at 614]). In other words, "two
> works are substantially similar if 'the ordinary observer,
> unless he set out to detect the disparities, would be disposed
> to overlook them, and regard their aesthetic appeal as the
> same.'" *Id.* (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner
> Corp.*, 274 F.2d 487, 489 (2d Cir.1960) [(Hand, J.)]).

*Landsted Homes, Inc. v. Sherman*, 305 F. Supp. 2d 976, 981 (W.D. Wis. 2002). We refer

to the side-by-side comparisons produced above without reproducing them here.

"'The question in each case is whether the similarity relates to matter that

constitutes a substantial portion of plaintiff's work[.]'" *Joint Comm'n on Accred. of*

*Healthcare Orgs. v. Greeley Co.*, No. 14 C 10225, 2016 WL 1450051, at *5 (N.D. Ill.

Apr. 13, 2016) (quoting Nimmer & Nimmer, *supra*, § 13.03[A][2][a]). "It has been said

that this test does not involve 'analytic dissection and expert testimony,' but depends on

whether the accused work has captured the 'total concept and feel' of the copyrighted

work." *Atari*, 672 F.2d at 614 (quoting *Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir.

1946); *Roth Greeting Cards v. United Card Co.*, 429 F.2d 1106, 1110 (9th Cir. 1970)).

We are careful to separate the protectible expression from the unprotectible idea of

Duncanson's works. *See* 17 U.S.C. § 102(a)–(b); *Atari*, 672 F.2d at 614–15. The idea of

birds sitting in a tree, for example, is of course unprotectible. *See Atari*, 672 F.2d at 615.

What is protectable is Duncanson's expression of that idea, to the extent of its originality.

*See id.* To be sure, "[t]here is no litmus paper test by which to apply the idea-expression

distinction; the determination is necessarily subjective." *Id.* In considering what the

original constituent elements of a representational painting are, we find instructive the

Seventh Circuit's discussion of originality in photography:

> Federal courts have historically applied a generous standard
> of originality in evaluating photographic works for copyright
> protection. In some cases, the original expression may be
> found in the staging and creation of the scene depicted in the
> photograph. But in many cases, the photographer does not
> invent the scene or create the subject matter depicted in it.
> Rather, the original expression he contributes lies in the
> rendition of the subject matter—that is, the effect created by
> the combination of his choices of perspective, angle, lighting,
> shading, focus, lens, and so on. *See Rogers v. Koons*, 960
> F.2d 301, 307 (2d Cir.1992) ("Elements of originality in a
> photograph may include posing the subjects, lighting, angle,
> selection of film and camera, evoking the desired expression,
> and almost any other variant involved."). Most photographs
> contain at least some originality in their rendition . . . .

*Schrock*, 586 F.3d at 519.

As to Counts 21, 31, 32, and 35, our task is not difficult. Here, the accused first-generation works are virtually identical to the corresponding works in suit. It follows that whatever is protectible in the works in suit has been transferred to and duplicated by the accused works. True, the accused works appear to have been executed with appreciably less artistry than the works in suit, particularly as to Counts 31, 32, and 35. But poor copies still infringe. *See Phoenix Entm't Partners v. Rumsey*, 829 F.3d 817, 830–31 (7th Cir. 2016) (dictum). Accordingly, a jury would be compelled to conclude that an ordinary observer, unless she set out to detect the disparities between these accused works and the works in suit, would be disposed to overlook them, and regard their aesthetic appeal as the same.

As to Count 13, the question is only a little closer. Virtually every artistically meaningful element present in Duncanson's *Twisting Love* has been transferred to the accused work, with the exception, as noted above, of the shape of the branches. The

accused work figures the branches in a clear heart-shape that is not present in the original. But "[v]ariants that result from tinkering with a copied form are derivative works from that form, and it is a copyright infringement to make or sell a derivative work without a license from the owner of the copyright on the work from which the derivative work is derived." *Bucklew v. Hawkins, Ash, Baptie & Co.*, 329 F.3d 923, 930 (7th Cir. 2003) (citing *inter alia Pickett v. Prince*, 207 F.3d 402, 405–07 (7th Cir. 2000)). And the variance is so confined to this narrow element that no jury could conclude it alone distinguishes the "total concept and feel" of the two works. *Atari*, 672 F.2d at 614 (internal quotations and citation omitted). Accordingly, we find substantial similarity as a matter of law.

As to Count 14, however, we find enough meaningful differences between Duncanson's *Spring Shine* and the accused work to preclude summary judgment in Duncanson's favor. The quality of the reproduction of the accused work in the record is quite poor. Nevertheless, it may be discerned that the style of the accused work is somewhat more naturalistic than that of the work in suit. More notably still, the effects created by the respective combinations of choices in lighting, shading, and color are appreciably different. Though mere use of a different color paint does not by itself defeat substantial similarity, *see Silver Streak Indus., LLC v. Squire Boone Caverns, Inc.*, 4:13-cv-00173-RLY-DML, 2015 WL 3884605, at *4 (S.D. Ind. June 24, 2015) (Young, J.) (citing *Novelty Textile Mills, Inc. v. Joan Fabrics Corp.*, 558 F.2d 1090, 1094 n.6 (2d Cir. 1977) (miscited as "7th Cir. 1977")), we conclude that a jury could find the total concept and feel of the two works sufficiently distinct to preclude infringement.

In sum, we find it beyond genuine dispute that Wine and Canvas painters factually copied the works in suit in Counts 13, 14, 21, 31, 32, and 35. We further find it beyond genuine dispute that Wine and Canvas painters infringed on Duncanson's copyrights in, that is, unlawfully appropriated the protectible expression of, the works in suit in Counts 13, 21, 31, 32, and 35.

Having navigated first-generation copying as described above, we find our analysis runs aground on the question of second- and third-generation copying. As already explained, under each count of her complaint, Duncanson seeks to hold the named Licensee contributorily liable for each act of second-generation copying by each student in attendance at the class, and directly liable for the third-generation copying. Further, under each of these counts, for each separate act of infringement, Duncanson seeks to hold W&C Holdings, McCracken, and Scott vicariously liable. For each generation of alleged infringement, liability derives from provable infringement in the prior generation as its necessary, but not sufficient, condition. That is, the second-generation copies infringe only if the first-generation copies do; and the third-generation copies infringe only if the second-generation copies do.

The entire record upon which Duncanson would have us impose second- and third-generation liability as a matter of law consists of Facebook photos posted by the Licensees showing groups of unidentified students in the process of painting or displaying their finished works. None of the photos purport to show every student in attendance at a particular class, and in some cases, Duncanson has not even obtained a binding admission that the persons pictured in the photos were, in fact, all Wine and

Canvas students. There is nothing other a reasonable inference impermissibly drawn in the movant's favor that each person pictured in the photos in fact painted the pictures they hold, and in fact painted them at the Wine and Canvas class at the direction of the Wine and Canvas painters. Many of the photos are small, grainy, or blurry, and many of the persons pictured in them appear even smaller, grainier, and blurrier—not to speak of the pieces of canvas they hold, some of which appear to be no more than patches of color.

As demonstrated above, copyright infringement requires patient, work-by-work analysis to establish factual and legal similarity. And imposing liability of any description requires individualized determination. *See Colbert v. City of Chicago*, 851 F.3d 649, 659 (7th Cir. 2017) (citing *Hessel v. O'Hearn*, 977 F.2d 299, 305 (7th Cir. 1992)). Duncanson's effort on summary judgment smacks too forcibly of mass proceedings, collective punishment, and guilt by association. Duncanson has not undertaken, and in her stead we will not undertake, the individualized analyses required for her to prevail. We express no opinion as to what a reasonable jury might decide on this record. But we are certain it cannot entitle Duncanson to judgment as a matter of law on the theories she advances.

B.  *Who Is Liable?*

With only these first-generation infringements to stand on, however, Duncanson's liability case loses all of its force. As to the first-generation infringements, Duncanson seeks to hold the named Licensee directly liable and W&C Holdings, McCracken, and Scott vicariously liable.

Duncanson has not demonstrated how the Licensees may be directly liable for the infringing activity of Wine and Canvas painters. Direct infringement requires "volitional" conduct by the defendant, or, more precisely, proximate causation of the infringement by the defendant. *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666–67 (9th Cir. 2017) (citing law of four circuits); *Flava Works, Inc. v. Gunter*, No. 10 C 6517, 2011 WL 1791557, at *2–3 (N.D. Ill. May 10, 2011) (citing law of two circuits). Duncanson has not shown compelling evidence that the Licensees to any extent caused the Wine and Canvas painters to produce infringing works. Indeed, the facts tend to show the contrary: to wit, that the Wine and Canvas painters' infringements preceded their involvement with Wine and Canvas, as the infringing works had to be painted before they could be submitted for consideration as Featured Paintings.

Duncanson's case for vicarious liability similarly fails. "To prevail on a claim for vicarious copyright infringement, a plaintiff must establish that 'the defendant has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity.'" *GC2 Inc. v. Int'l Game Tech. PLC*, 255 F. Supp. 3d 812, 824 (N.D. Ill. 2017) (quoting *Perfect 10*, 847 F.3d at 673). Duncanson has not shown compelling evidence that these first-generation copies were produced under conditions which W&C Holdings, McCracken, or Scott had the right or ability to supervise. Rather, the facts suggest that the infringing copies were produced independently of Wine and Canvas's involvement and submitted to Wine and Canvas only after they were produced.

In sum, because Duncanson has failed to prove infringements with which named Defendants had sufficient involvement, Duncanson is not now entitled to summary

judgment on any question of liability. The case for damages, of course, falls with the case for liability. However, "[i]f the court does not grant all the relief requested by [a] motion [for summary judgment], it may enter an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g). Accordingly, we conclude with an order establishing as beyond dispute the first-generation infringements identified above.

## II. As to the Defaulted Licensees, Duncanson's Entitlement to the Relief She Seeks Is Genuinely Disputed

As to defaulted Counts 2 and 7, Duncanson seeks her actual damages plus the Licensee's profits. *See* 17 U.S.C. § 504(b). However, Duncanson's calculations of actual damages are unsupported by the record. In her brief, she states that she "would have earned $2 per customer had [a Licensee] entered into a licensing agreement with her to use her artwork." Br. Supp. 52. Duncanson then calculates her damages by multiplying the number of students at a specific class by $2. However, the $2 figure is not supported by any cited evidence, not even Duncanson's own affidavit. Accordingly, as to these Counts, Duncanson's damages are genuinely disputed.

As to defaulted Counts 8, 10, 15, 16, 18, 20, 22, 23, 26, 27, 33, 36, 37, 38, and 39, Duncanson seeks maximum statutory damages, fully enhanced for willful infringement. *See* 17 U.S.C. § 504(c). However, Duncanson has not presented any evidence or argument that the defaulted Licensees knew that their conduct was infringing or acted in reckless disregard of Duncanson's copyrights. *See Wildlife Express*, 18 F.3d at 511 (standard). Accordingly, Duncanson's statutory damages are genuinely disputed.

## Conclusion and Order

For the reasons explained above:

Duncanson's *Motion to Exceed Summary Judgment Page Limits* is GRANTED.

Duncanson's *Motion for Summary Judgment* is DENIED, except that the following material facts are established beyond genuine dispute:

1. The Wine and Canvas painter produced an infringing copy of *Twisting Love*, as charged in Count 13 of the operative complaint;

2. The Wine and Canvas painter produced an infringing copy of *Birds of a Feather*, as charged in Count 21 of the operative complaint;

3. The Wine and Canvas painter produced an infringing copy of *Birds of a Feather*, as charged in Count 31 of the operative complaint;

4. The Wine and Canvas painter produced an infringing copy of *Out West*, as charged in Count 32 of the operative complaint; and

5. The Wine and Canvas painter produced an infringing copy of *Visionary Delight*, as charged in Count 35 of the operative complaint.

IT IS SO ORDERED.

Date:  9/30/2018

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Cynthia Conlin
CYNTHIA CONLIN, P.A.
cynthia@cynthiaconlin.com

P. Adam Davis
DAVIS & SARBINOFF LLC
efiling@d-slaw.com

Tony Pagan, Jr.
CYNTHIA CONLIN & ASSOCIATES
1643 Hillcrest Street
Orlando, FL 32803

Antonio Pagan, Jr.
CYNTHIA CONLIN and ASSOCIATES
tony@conlinpa.com

Jennifer Dawn Reed
CYNTHIA CONLIN and ASSOCIATES
jennifer@cynthiaconlin.com